## UNITED STATES DISTRICT COURT
## XXXXX

| | |
|---|---|
| [UNDER SEAL],<br><br>Plaintiff(s),<br><br>vs.<br><br>[UNDER SEAL],<br><br>Defendant(s). | Case No. _5:21-cv-236-TKW-MJF_<br><br>**COMPLAINT**<br><br>**FILED *IN CAMERA* & UNDER SEAL<br>PURSUANT TO 31 U.S.C. § 3730**<br><br>**NOT FOR PUBLIC DISCLOSURE<br>DO NOT PLACE IN PRESS BOX<br>DO NOT ENTER ON PACER** |

FILED USDC FLND TL
DEC 14 '21 PM3:32

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF FLORIDA**
**TALLAHASSEE DIVISION**

|  |  |
|---|---|
| UNITED STATES OF AMERICA, *ex rel.* ARIEL BOWEN,<br><br>Plaintiff/Relator,<br><br>v.<br><br>ABSOLUTE PHYSICAL & AQUATIC THERAPY, LLC AND CHIPLEY PHYSICAL THERAPY, INC.<br><br>Defendants. | Case No. 5:21-cv-236-TKW-MJF<br><br>**COMPLAINT**<br><br>**FILED *IN CAMERA* & UNDER SEAL PURSUANT TO 31 U.S.C. § 3730**<br><br>**NOT FOR PUBLIC DISCLOSURE DO NOT PLACE IN PRESS BOX DO NOT ENTER ON PACER** |

### *QUI TAM* COMPLAINT

Relator Ariel Bowen, on behalf of herself and the United States of America, alleges and claims against Defendants Absolute Physical & Aquatic Therapy, LLC and Chipley Physical Therapy, Inc. as follows:

### INTRODUCTION

1.    Defendants provide physical therapy and physical therapy billing services across three different clinics in the Florida panhandle.

2.    Defendants have for years systematically and routinely flaunted Medicare regulations and defrauded the United States by manipulating the billing process to maximize Medicare reimbursements and minimize the amount of care actually provided to patients. Defendants have knowingly billed the United States for services that were not provided, or that were not provided as required by law, while simultaneously providing poor or substandard services to patients.



FILED USDC FLND TL
DEC 14 '21 PM 3:32

3.      Defendants knowingly billed Medicare for inadequate services performed solely by unsupervised non-physical therapists, including Physical Therapy Assistants ("PTAs"), clinical technicians, and even untrained office staff. To avoid detection and ensure reimbursement, Defendants falsified patient records and requests for payment to make it appear as if Physical Therapists ("PTs") supervised or performed these services.

4.      Despite knowing that certain services were being performed by non-PTs without PT supervision, and that such services were not payable under the Medicare program, Defendants knowingly billed Medicare and other government payors for physical therapy services. Rather than simply hiring additional PTs, Defendants consistently overscheduled their understaffed PTs and simply ignored or flouted Medicare regulations, knowing that their PTs lacked time to provide adequate care to the patients on schedule within Medicare regulations.

5.      To avoid the costs of hiring additional PTs while still maintaining large reimbursements, Defendants pushed their PTs to manipulate the billing process by providing therapy to large groups of patients at once, then billed Medicare as if the therapy had been provided to each patient individually.

6.      In doing so, Defendants received unearned and inflated reimbursements from Medicare.

7.      All the while, Defendants deliberately attempted to hide the fraudulent billing and inadequate services by disregarding Medicare regulations even further. To evade detection and enhance profits, Defendants consistently altered the "who," the "when," and the "where" on billing records, making it appear that services had been rendered or supervised by a PT who had never actually seen the patient, at clinics where the PT had not been present, and at times that the PT had been in a completely different city.

8.      Defendants also manipulated their system of patient recordkeeping to further conceal and advance their fraudulent practices, even when doing so was to the direct disadvantage of patients and in contravention of Medicare requirements.

9.      Defendants are aware that their practices are improper and unlawful. However, Defendants' owners and CEO have developed and promulgated a culture of intimidation that is intended to dissuade and punish any dissent to their fraudulent practices.

## JURISDICTION AND VENUE

10.      This action arises under the False Claims Act, 31 U.S.C. §§ 3729-33.  Accordingly, this Court has jurisdiction pursuant to 28 U.S.C. § 1331. Jurisdiction is also authorized under 31 U.S.C. § 3732(a).

11.      Venue lies in this judicial district pursuant to 31 U.S.C. § 3732(a) because Defendants qualify to do business in Florida, transact substantial business in Florida, transact substantial business in this judicial district, and can be found here. Additionally, and as described herein, Defendants committed within this judicial district acts proscribed by 31 U.S.C. § 3729. Specifically, Defendants submitted and caused to be submitted within this judicial district false claims to Medicare.

## PARTIES

12.      Chipley Physical Therapy ("CPT") provides outpatient physical and aquatic therapy services across three clinics located in three separate cities in the Florida panhandle: Chipley, Marianna, and Bonifay.

13.      CPT is owned and operated by Ruben and Lorrie Laurel. Ruben acts as CEO of the company, managing the day-to-day operation, while Lorrie is one of CPT's two current physical therapists ("PTs").

14.    CPT's Chipley location serves as its headquarters and principal place of business. The Chipley clinic is the largest of the three clinics, offers full physical and aquatic therapy services, and houses CPT's administrative staff and billing department. From February 2020 to March 2021, Relator Ariel Bowen was the primary PT at the Chipley location, in charge of performing patient evaluations and supervising treatment.

15.    Situated in the middle of the other two clinics, the Chipley clinic is approximately 21 miles from the Marianna clinic and 11 miles from the Bonifay clinic.

16.    CPT's Marianna clinic also provides comprehensive physical and aquatic therapy services, but it has a much smaller staff than the Chipley clinic. During Relator's tenure at CPT, Swati Gulwani was the only PT at the Marianna location.

17.    CPT's Bonifay location is the smallest of the three clinics. Unlike Chipley and Marianna, the Bonifay clinic is only open three days a week, and it does not have a PT on location. As a result, CPT requires that Bonifay patients be evaluated and scheduled at the Chipley location, then treated by a physical therapy assistant ("PTA") at Bonifay.

18.    Absolute Physical & Aquatic Therapy ("APAT") is a physical therapy billing company also owned and operated by Ruben Laurel. APAT operates out of the same location as CPT's Chipley clinic, which promotes both CPT and APAT on its street-facing sign.

19.    Upon information and belief, APAT provides CPT with physical therapy billing services.

20.    Relator Ariel Bowen worked as a physical therapist at CPT from February 2020 to March 2021.

21.    Prior to joining CPT, Bowen provided inpatient physical therapy services at Chipley Hospital and then outpatient physical therapy and skilled nursing services at Hartford

Healthcare. In addition, Bowen completed thirty-two weeks of clinical rotations at nursing homes and physical therapy clinics around Florida before her stint at Chipley Hospital.

22.    In her role as the primary physical therapist at CPT's Chipley location, Bowen was able to witness firsthand CPT's fraudulent billing schemes, as well as the coordinated efforts that CPT took to conceal its fraud.

## DISCLOSURE

23.    Prior to filing this Complaint, Relator voluntarily disclosed to the United States the information upon which this action is based. To the extent that any public disclosure has taken place as defined by 31 U.S.C. §3739(e)(4)(A), Relator is the original source of the information for purposes of that section. Alternatively, Relator has knowledge that is independent of and materially adds to any purported publicly disclosed allegations or transactions, and Relator voluntarily provided that information to the Government before filing this Complaint. Relator is serving contemporaneously herewith a statement of the material evidence in their possession upon which their claims are based.

## RELEVANT RULES AND REGULATIONS

**The United States False Claims Act**

24.    The False Claims Act provides, in pertinent part, that a person is liable to the United States who: knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval; knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim; knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay money to the government; knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay money or property to the government; or conspires to commit any of the above violations. 31 U.S.C. § 3729(a)(1).

25.     Liable parties must pay the government a civil penalty of not less than $5,500 and

not more than $11,000, as adjusted by the Federal Civil Penalties Inflation Adjustment Act of 1990

(28 U.S.C. 2461; Public Law 104-410), plus three times the amount of damages which the

Government sustains. *Id*. § 3729(a)(1)(G).

26.     The term "claim" means any request or demand for money or property that: (i) is

presented to an officer, employee, or agent of the United States; or (ii) is made to a contractor,

grantee, or other recipient, if the money or property is to be spent or used on the Government's

behalf or to advance a Government program or interest, and if the United States Government

provides or has provided any portion of the money or property requested or demanded; or will

reimburse such contractor, grantee, or other recipient for any portion of the money that is requested

or granted. *Id*. § § 3729(b)(2).

27.     The term "obligation" includes the retention of any overpayment. *Id*. § 3729 (b)(3).

28.     "Knowing" and "knowingly" "(A) mean that a person, with respect to information

(i) has actual knowledge of the information; (ii) acts in deliberate ignorance of the truth or falsity

of the information; or (iii) acts in reckless disregard of the truth or falsity of the information; and

(B) require no proof of specific intent to defraud[.]" *Id*. § 3729(b)(1).

29.     The statute of limitations is 6 years after the date on which the violation of section

3729 is committed, or more than 3 years after the date when facts material to the right of action

are known or reasonably should have been known by the official of the United States charged with

responsibility to act in the circumstances, but in no event more than 10 years after the date on

which the violation is committed, whichever occurs last.  *Id*. § 3731(b).

## MEDICARE COVERAGE OF PHYSICAL THERAPY SERVICES

30.     Through the Medicare program, Title XVIII of the Social Security Act, 42 U.S.C. §§ 1395, *et seq.*, the United States provides health insurance coverage for eligible citizens. The United States Department of Health and Human Services, specifically the Centers for Medicare and Medicaid Services ("CMS"), oversees the administration of Medicare.

31.     Under Part B of the Medicare program, eligible beneficiaries can receive outpatient physical therapy services from clinical providers, *see* 42 U.S.C. § 1395k(a)(2)(C); 42 C.F.R. § 410.10, including aquatic or pool therapy services.[1]

32.     Provided that the clinic rendering physical therapy services meets several requirements, CMS will reimburse the clinical provider for the services that it provides to Medicare patients. *See* 42 U.S.C. § 1395l(a)(8); 42 C.F.R. § 410.150(b)(7).

### A.  Conditions for Medicare Reimbursement: Outpatient Physical Therapy Clinics

33.     As with all Medicare programs, the services rendered by clinics providing physical therapy must be reasonable and medically necessary for the treatment of the patient's illness or injury to be eligible for Medicare reimbursement. *See* 42 U.S.C. §1395y(a)(l)(A); 42 U.S.C. § 1396, *et seq.*; 42 C.F.R. § 485.707.

34.     In addition to the general "reasonable and necessary" requirement, Medicare also specifically requires that physical therapy clinics "provide[] an adequate program of physical therapy and ha[ve] an adequate number of qualified personnel and the equipment necessary to carry out its program and to fulfill its objectives." 42 C.F.R. § 485.713.

---

[1] *See* CENTERS FOR MEDICARE AND MEDICAID SERVICES, PUB. 100-02, MEDICARE BENEFITS POLICY MANUAL, CH. 15, § 220(C).

35.    For services provided by PTAs to be considered adequate, and thus eligible for Medicare reimbursement, "[a] qualified physical therapist [must be] present or readily available to offer supervision." 42 C.F.R. § 485.713; *see also* 42 C.F.R. § 410.60.

36.    Because physical therapy services must be "provided by, or under the supervision of, a qualified physical therapist" to be eligible for Medicare reimbursement, the "number of qualified physical therapists and qualified physical therapist assistants [must also be] adequate for the volume and diversity of physical therapy services offered." *Id.*

37.    Because accurate recordkeeping is necessary to provide adequate care and prevent fraudulent billing, CMS also requires that physical therapy clinics billing Medicare "maintain[] clinical records on all patients in accordance with accepted professional standards, and practices." 42 C.F.R. § 485.721.

38.    Specifically, "clinical records [must be] completely and accurately documented, readily accessible, and systematically organized to facilitate retrieving and compiling information." *Id.*

39.    In addition, each PT must "sign[] the entries that he or she makes in the clinical record." *Id.*

**B. How Physical Therapy Services are Provided under Medicare**

40.    Physical therapy services provided by clinics to Medicare beneficiaries begin with an initial evaluation, generally performed by the "physical therapist who furnishes the physical therapy services," that sets the patient's plan of treatment. 42 C.F.R. § 410.61.

41.    The purpose of the initial evaluation is to determine "the type, amount, frequency, and duration of the physical therapy . . . to be furnished to the individual, and indicate[] the diagnosis and anticipated goals." 42 C.F.R. § 410.61.

42.    While a PTA may assist the PT in the initial evaluation, Medicare makes clear that "PTAs may not provide evaluative or assessment services, make clinical judgments or decisions; develop, manage, or furnish skilled maintenance program services; or take responsibility for the service."[2]

43.    Once a Medicare patient has been evaluated by a PT, they can begin receiving physical therapy services in accordance with the plan of treatment. 42 C.F.R. § 410.60.

44.    Physical therapy services can be provided to patients either individually or in a group setting, so long as doing so aligns with the patient's plan of treatment. Therapy services are considered individual "[w]hen direct one-on-one patient contact is provided" by the PT.[3]

45.    Group therapy, on the other hand, is defined as "simultaneous treatment to two or more patients who may or may not be doing the same activities."[4] For instance, "[i]f the therapist is dividing attention among the patients, providing only brief, intermittent personal contact, or giving the same instructions to two or more patients at the same time," the service is considered group therapy for purposes of Medicare billing.[5]

46.    If the patient requires additional physical therapy services upon completion of the plan of treatment, they may be re-evaluated and a new plan of treatment set.[6]

47.    For every physical therapy treatment service provided, physical therapy clinics must maintain adequate documentation.[7] The purpose of maintaining accurate treatment notes "is

---

[2] Id. § 230.1.
[3] CENTERS FOR MEDICARE AND MEDICAID SERVICES, 11 PART B BILLING SCENARIOS FOR PTS AND OTS, https://www.cms.gov/Medicare/Billing/TherapyServices/Downloads/11_Part_B_Billing_Scenarios_for_PTs_and_OTs.pdf.
[4] Id.; CENTERS FOR MEDICARE AND MEDICAID SERVICES, PUB. 100-02, MEDICARE BENEFITS POLICY MANUAL, CH. 15, § 230.
[5] Id.
[6] CENTERS FOR MEDICARE AND MEDICAID SERVICES, PUB. 100-02, MEDICARE BENEFITS POLICY MANUAL, CH. 15, § 220.3(C).
[7] Id. § 220.3(E).

simply to create a record of all treatments and skilled interventions that are provided and to record the time of the services in order to justify the use of billing codes on the claim."[8]

48.     At a minimum, physical therapy treatment notes <u>must</u> include the following:

a)  Date of treatment;

b)  Identification of each specific intervention/modality provided and billed, for both timed and untimed codes;

c)  Total timed code treatment minutes and total treatment time in minutes; and

d)  Signature and professional identification of the qualified professional who furnished or supervised the services and a list of each person who contributed to that treatment.[9]

**C. How Physical Therapy Services are Billed under Medicare**

49.     The reimbursement that clinics receive for providing physical therapy evaluation and treatment is regulated using billing "codes" as adopted by CMS. 42 U.S.C. 1395m(k)(5); 42 C.F.R. § 414.40.

50.     The codes for physical therapy evaluation (97001) and re-evaluation (97002) are considered "untimed" codes.[10] This means that, regardless of whether the evaluation takes 15 minutes or 60 minutes, the reimbursement to the clinic will be the same.

51.     Likewise, group therapy services (97150) are considered untimed.[11]

52.     Conversely, individual therapy services, such as therapeutic exercise (97110), gait training (97116), or manual therapy (97140), are considered "timed" codes.[12]

---

[8] *Id.*
[9] *Id.*
[10] *See* CENTERS FOR MEDICARE AND MEDICAID SERVICES, 11 PART B BILLING SCENARIOS FOR PTS AND OTS, https://www.cms.gov/Medicare/Billing/TherapyServices/Downloads/11_Part_B_Billing_Scenarios_for_PTs_and_OTs.pdf.
[11] *Id.*
[12] *Id.*

53.    With timed codes, the clinic providing physical therapy services bills Medicare for 15-minute "units" of time.[13] A single 15-minute unit of service can be billed "for treatment greater than or equal to 8 minutes through and including 22 minutes."[14] In other words, a "unit" of billable service accrues after 8 minutes and lasts until 22 minutes.

54.    After the initial eight-minute threshold is passed, a new unit will begin every fourteen minutes. So, when the time of service reaches twenty-three minutes, the clinic can bill for two units of physical therapy, and after thirty-eight minutes, the clinic may bill three units, and so on.[15]

55.    Importantly, "timed" individual therapy services generally result in higher reimbursements for the clinical provider than "untimed" group therapy services.[16]

56.    Medicare also requires billing modifiers to help distinguish between physical therapy services provided in whole by PTs and those that are provided at least in part by PTAs. For instance, CMS began requiring on January 1, 2020, that all "[c]laims for services furnished in whole or in part by a physical therapist assistant must include the prescribed modifier." 42 C.F.R. § 410.60.

57.    This modifier (CQ) must be added to the billing code whenever more than 10 percent of the total minutes of physical therapy service provided to the patient was furnished by a PTA. 42 C.F.R. § 410.60.

---

[13] CENTERS FOR MEDICARE AND MEDICAID SERVICES, PUB. 100-04, MEDICARE CLAIMS PROCESSING MANUAL, CH. 5, § 20.2.
[14] Id.
[15] See id.
[16] See CENTERS FOR MEDICARE AND MEDICAID SERVICES, 11 PART B BILLING SCENARIOS FOR PTS AND OTS, https://www.cms.gov/Medicare/Billing/TherapyServices/Downloads/11_Part_B_Billing_Scenarios_for_PTs_and_O Ts.pdf.

58.     Due to the importance of accurate coding in determining reimbursement rates, CMS requires that each request for payment include the appropriate billing codes and imposes civil penalties on providers who knowingly and willfully fail to do so. *See* 42 C.F.R. § 402.1.

### CHIPLEY PHYSICAL THERAPY'S
### FRAUDULENT AND UNLAWFUL ACTIVITIES

59.     CPT has, for multiple years, defrauded the United States by submitting, or causing to be submitted, false or fraudulent claims to Medicare.

60.     CPT's fraud is carried out in three distinct, but related ways:

a) First, CPT improperly bills Medicare for physical therapy services provided by non-PTs without the assistance or supervision of a PT.

b) Second, CPT falsifies medical records and bills to Medicare and knowingly fails to use required billing code modifiers to make it appear as if physical therapy services provided by non-PTs were provided by PTs who in fact never saw – and were not even physically present at the same location as – the patient.

c) Third, CPT manipulates billing codes to receive inflated *individual* therapy reimbursements for therapy services provided to *groups* of patients.

61.     In addition to the above, CPT actively attempts to deceive regulators and conceal its fraudulent billing through inaccurate, noncompliant, and intentionally inefficient recordkeeping.

62.     CPT's systematic and institutionalized scheme is designed to maximize the amount of Medicare reimbursement it receives for each patient, whether it is legally permitted to do so or not, and with total disregard for the health and medical needs of the patient.

63.     This fraud is systemic. CPT's co-owners, Ruben, and Lorrie Laurel, have created and maintained a refined process through which their three clinics receive unearned Medicare payments for inadequate and non-existent services.

64.     Through a concerted effort to manipulate codes, falsify patient notes, and silence any dissent among its staff, CPT has created a corporate culture that forces compliance with its fraudulent schemes.

65.     In addition to being systemic, the fraud is well-known and endorsed by CPT management.

66.     CPT has further defrauded the United States by its failures to report past overpayments and to reimburse Medicare for these overpayments.

**A.      CPT Fraudulently Bills for Inadequate Services Provided by Non-Physical Therapists.**

67.     Rather than incur the costs of hiring additional PTs or forgo profits by scheduling less patients, CPT routinely and consistently charged Medicare and other third-party payers for physical therapy services that were neither provided nor supervised by PTs.

68.     By billing Medicare for physical therapy services provided solely by non-PTs – including some staff who had no physical therapy training whatsoever, CPT received inflated and unearned reimbursements.

69.     CPT's system of improperly billing Medicare for services provided by PTAs and technicians was already in place at the time Relator Bowen was hired in February 2020 and extended through and after the time Bowen left CPT in March 2021.

70.     During Bowen's tenure at CPT, she was one of only three PTs employed by CPT across its three locations.

71.     However, CPT only had two "active" PT's during this time; co-owner Lorrie Laurel, one of the three certified PTs, rarely came into any of the three CPT clinics, so Bowen was effectively the only PT working consistently across all three of CPT's locations for most of her employment at CPT.

72.     In fact, for the bulk of her 13 months with CPT, Bowen never saw Laurel provide physical therapy evaluation or treatment for CPT, even though Laurel primarily reported to the same location as Bowen. Moreover, from around March 2020 until about October 2020, Bowen never recalled Laurel even being present at any of the three clinics.

73.     Furthermore, while Bowen was originally told that she would be the evaluating PT at both the Chipley and Bonifay locations, CPT scheduled Bowen to work at the Chipley clinic the vast majority of the time. As a result, the Bonifay clinic was essentially left without a qualified PT.

74.     Due to Bowen's commitments at the Chipley clinic and Laurel's absence, patients at Bonifay were treated almost exclusively by Wayne Taylor, a PTA. Taylor provided physical therapy services to Bonifay patients three days a week, each time without supervision from a qualified PT.

75.     While Taylor occasionally assisted Bowen at CPT's Chipley location, Bowen worked alongside Taylor at the Bonifay location on no more than three occasions during her entire time with CPT.

76.     Due to the lack of qualified PTs on-site at CPT's Bonifay clinic, all Bonifay patients were required to travel to the Chipley location to receive their initial evaluation from the PT there, which was usually Relator Bowen.

77.    This initial evaluation was almost always the first and last time that Bonifay patients would receive physical therapy services from, or supervised by, a PT. Once the patient began to receive treatment at Bonifay, they would *only* receive care from Taylor, the PTA.

78.    Even though physical therapy clinics are not allowed to bill Medicare for services provided by PTAs without PT supervision, *see* 42 C.F.R. §§ 410.60; 485.713, CPT routinely billed for physical therapy services provided solely by Taylor at the Bonifay location, even when he was the only member of the CPT staff in the building.

79.    CPT's practice of billing Medicare for medically inadequate PT services provided by non-PTs was not limited to Taylor or Bonifay.

80.    While aquatic therapy services are generally eligible for Medicare reimbursement, like every other physical therapy service they must be provided by or under the supervision of a PT.[17]

81.    However, at the Chipley location, "Melissa," a massage therapy technician, routinely provided aquatic therapy services without direct PT supervision.

82.    In fact, Melissa provided aquatic therapy so regularly that Relator Bowen believed her to be a PTA for a time. When Bowen finally learned that Melissa was actually a massage therapy technician, she asked Melissa how she was able to provide aquatic services to Medicare patients without PT supervision. Melissa simply responded that she had been doing so for years.

83.    Even if Melissa *had* been supervised by a PT, she did not qualify as a PT or PTA for purposes of Medicare reimbursement, *see* 42 C.F.R. § 484.115, making any services provided by her medically inadequate and ineligible for Medicare payment, *see* 42 C.F.R. § 485.713.

---

[17] *See* CENTERS FOR MEDICARE AND MEDICAID SERVICES, PUB. 100-02, MEDICARE BENEFITS POLICY MANUAL, CH. 15, § 220(C).

84.    Nonetheless, CPT routinely billed Medicare for Melissa's services and improperly received payments in return.

85.    CPT's routine practice of overscheduling Medicare patients for the number of available PTs also resulted in improper billing for PTA-provided physical therapy services.

86.    For instance, CPT's receptionists were instructed by management to schedule each clinical day as fully as possible, scheduling a single hour to full capacity before scheduling patients for a different hour slot.

87.    As a result, a single location would often have as many as six or seven patients in a single hour. At no point during Relator Bowen's tenure at CPT did CPT ever have more than one PT providing services at any location. On a routine basis, Relator Bowen would provide evaluations in one room while PTAs provided treatment for patients – without any supervision by a PT – in a different room.

88.    Despite having Bowen on-site to provide supervision in Chipley, CPT's intentional overscheduling made it virtually impossible for her to provide supervision for the treatment provided by the PTAs.

89.    CPT's operational practice of having PT services provided by PTAs was only exacerbated during the Covid-19 pandemic.

90.    To cut costs and counteract the effects of the decreased demand for physical therapy services resulting from the Covid-19 pandemic, CPT changed Bowen's pay status from salaried to hourly.

91.    Following this change, CPT began to shift services away from its PTs and even further onto its PTAs. CPT cut the hours of Bowen and its one other PT, yet maintained the hours of its PTAs and technicians.

92.     For example, when CPT's Chipley clinic had no evaluations scheduled for the day, CPT would send Bowen home and leave the PTAs and technicians to provide treatment to Bowen's patients, without supervision by a PT.

93.     As a result, treatment would only be provided by non-PTs, and no PTs would be on-site to offer supervision.

94.     This occurred on multiple occasions and resulted in inadequate services being billed to Medicare.

95.     CPT's intentional overscheduling also resulted in bills to Medicare for services provided by employees with no physical therapy training whatsoever.

96.     CPT would schedule as many as seven patients in an hour, with Bowen performing evaluations in one room and PTAs performing treatment in another. This made it difficult, if not impossible, for the PT to also provide aquatic therapy services.

97.     Rather than reschedule aquatic therapy patients for a different time, CPT regularly instructed its receptionists to watch over patients in the pool to ensure that they did not injure themselves or drown, as no other staff members with therapy training were available to offer even basic supervision.

98.     Specifically, Bowen witnessed Robbin Addison, Amanda Lee, and "Sarah" – all untrained, unlicensed administrative staff members – assisting Medicare patients in the pool because no PT or PTA was available.

99.     Upon information and belief, CPT billed Medicare for the aquatic services "provided" by these untrained and unlicensed office workers.

100.    Because of its sustained practice of billing for services provided by non-PTs and without PT supervision, CPT improperly received payment for services that were not eligible for Medicare reimbursement. *See* 42 C.F.R. §§ 410.60; 485.713.

**B.    CPT Falsifies Bills to Make it Appear as if Physical Therapy Services Were Provided by Physical Therapists Who Never Actually Saw the Patient.**

101.    Because Medicare does not provide payment for services furnished by non-PTs without sufficient PT supervision, *see* 42 C.F.R. §§ 410.60; 485.713, CPT engaged in a systematic scheme of falsifying bills to both cover its tracks and inflate its reimbursements.

102.    CPT routinely and consistently falsified bills and patient records to make it appear as if PTs were performing and supervising the physical therapy services it billed for, even though these services were actually provided by non-PTs.

103.    CPT's practice of fraudulently altering Medicare bills and patient records occurred even when the PT being billed was not even in the same physical building as the employee *actually* rendering the service.

104.    For instance, Relator Bowen only supervised Wayne Taylor, a PTA, or provided PT services herself at CPT's Bonifay location, on less than 5 occasions during her entire thirteen-month tenure with CPT.

105.    Yet, even though Bowen was almost always at CPT's Chipley location – located about 11 miles away from Bonifay – CPT systematically falsified bills for services provided by Taylor to make it appear as if Bowen either supervised Taylor or performed the services herself.

106.    Thus, because all the services provided by Taylor were not eligible for Medicare reimbursement, CPT simply falsified its bills and patient records to make the services provided by Taylor appear eligible for reimbursement.

107.    As a result, Medicare paid CPT bills which listed Bowen as either supervising or treating PT for Bonifay patients who Bowen never treated, and who had received bills for physical therapy that occurred in the Bonifay clinic while Bowen was in actuality several miles away at the Chipley clinic.

108.    Due in part to Bowen's protestations that Taylor, a PTA, was providing unsupervised physical therapy services at the Bonifay location, CPT eventually hired "Matt," a PT, on a part-time basis.

109.    CPT told Bowen that its plan was for Matt to take over as the supervising PT for the Chipley location on the three days out of the week that the Bonifay clinic was open. This would then allow Bowen to provide physical therapy services and supervise PTA Taylor at the Bonifay clinic.

110.    To ensure that each clinic had a supervising PT on location at all times, Matt and Bowen were never supposed to be at the same clinic at the same time.

111.    However, CPT almost exclusively scheduled both Matt and Bowen at CPT's Chipley clinic, due to the higher demand of patients at that location. Thus, despite hiring a new part-time PT, CPT continued to operate the Bonifay clinic without a PT on-site.

112.    After only about a month with CPT, Matt became so uncomfortable with CPT's administration and its practice of overscheduling patients that he quit. After Matt quit, CPT made no further attempts to staff the Bonifay location with a PT.

113.    CPT's practice of falsely altering the identity of the service provider on bills was systematic and occurred across all three of the CPT clinic locations – not just the perpetually understaffed Bonifay clinic.

114.    For example, CPT used Bowen's and the other PTs' national provider numbers to bill for aquatic therapy services provided by Melissa, a massage therapist, and unsupervised physical therapy services provided by Gloria and Bridget, both PTAs, at the Chipley clinic.

115.    As a result, Medicare made payments to CPT for services provided by non-eligible staff members and billed under a randomly chosen PT's national provider number.

116.    Moreover, Bowen never witnessed Lorrie Laurel providing supervisory services, or PT services, in any of the three clinics throughout 2020, and Bowen did not even witness Lorrie *physically present* at any of the clinics from March 2020 until about October 2020. Yet, CPT consistently submitted bills to Medicare for payment using Lorrie Laurel's national provider number.

117.    Bowen soon learned that if a bill contained Lorrie's name as supervising or evaluating PT, it was almost invariably fabricated; Lorrie rarely met with any of the patients whose bills listed her as the treating PT.

118.    In fact, several CPT patients who received bills identifying Lorrie Laurel as the PT providing services complained to Bowen, with at least one patient asking Bowen, "Who is Lorrie?" when confronted with a bill for services that had actually been provided by a PTA.

119.    While CPT knew that Lorrie, Bowen, and the other PTs never actually provided or supervised services to these patients, and oftentimes were not even in the same clinic at the same time as those patients, CPT nevertheless added a PT's name and national provider number for every service billed to Medicare, and intentionally billed Medicare for PT services that CPT knew were not provided by that PT.

120.    CPT also knowingly failed to apply billing code modifiers to further keep up the appearance that PTs were performing services actually performed by PTAs.

121.    As required by CMS, all "[c]laims for services furnished in whole or in part by a physical therapist assistant [after January 1, 2020] must include the prescribed [CQ] modifier." 42 C.F.R. § 410.60. Specifically, CMS requires that the CQ modifier be added to the billing code whenever more than 10% of the total minutes of physical therapy service provided to the patient was furnished by a PTA. *Id.*

122.    As alleged in the preceding paragraphs, nearly every physical therapy service at CPT's Bonifay clinic during Relator Bowen's tenure was provided exclusively by Wayne Taylor, a PTA, while unsupervised by a PT.

123.    Similarly, and as alleged in the preceding paragraphs, physical therapy services at CPT's Chipley clinic were also routinely provided solely by PTAs without PT supervision.

124.    Even though (1) CPT knew that it was billing for physical therapy services that were routinely furnished in whole by unsupervised PTAs and (2) CPT knew that such services required the CQ billing modifier, CPT, upon information and belief, never applied the CQ billing modifier in bills to Medicare.

125.    While claims made using the CQ modifier do not result in a decreased reimbursement from Medicare until January 1, 2022, *see id.*, CPT's knowing failure to use the CQ modifier for services provided solely by PTAs further evidences its scheme to make it appear as if services performed by unsupervised non-PTs were performed by PTs.

126.    By not applying the CQ modifier to services provided by Taylor and other unsupervised PTAs, CPT essentially represented to Medicare that more than 90% of the service being billed for was provided by a PT. In actuality, this number was usually 0%, as oftentimes no PT was even in the building at the time the service was provided.

127.    Through its systematic abuse of the Medicare billing process, including its intentional falsification of clinical records and requests for payment and its knowing failure to apply necessary billing code modifiers, CPT received unearned and inflated Medicare reimbursements.

### C.    CPT Manipulates Billing Codes to Receive Inflated Payments for Group Therapy Services.

128.    CPT's failure to adequately staff its clinics did not just result in the fraudulent billing of services rendered by non-PTs; CPT also manipulated billing codes for group therapy services to earn unearned Medicare reimbursements.

129.    Because of CPT's inadequate staffing and overscheduling of patients, Relator Bowen and the rest of CPT's clinical staff could not always provide patients with individualized therapy. Instead, group therapy was often the only way to provide any level of care without turning patients away.

130.    This was due, in part, to CPT co-owner Ruben Laurel's repeated instruction to Bowen and the other employees that turning away patients would lead to firing.

131.    For instance, employees received verbal reprimands if patients sat in the waiting room for too long, even if the PT or PTA already had five patients to treat.

132.    On some occasions, patients came in hours before their scheduled time, and CPT still instructed its clinical staff to not turn them away lest they face reprimand or termination.

133.    On at least one occasion, Gloria, a PTA at the Chipley location, told Ruben Laurel that she could not ethically provide PT services to more than two patients at a time. Ruben told her that if she could not do so, then she would no longer have a job with CPT.

134.    Immediately after this incident, Ruben called Bowen into his office and confronted her regarding her and other employees' complaints regarding patient scheduling, repeating his

threat to Gloria that Bowen's job depended on continuing to see and bill for individual PT services for multiple patients at a time.

135.    Ruben Laurel repeatedly made clear to Bowen and the other employees on multiple occasions that any attempts to "rock the boat" would be futile and that anyone unwilling to comply with CPT's scheme would be terminated.

136.    In fact, CPT's continued over-booking of patients ultimately led Matt, a PT, and Bridget and Gloria, both PTAs, to leave the clinic for good.

137.    Both Bridget and Gloria told Bowen prior to quitting that they felt CPT's practice of overbooking its schedule to be both unsafe and unethical, but they had no other choice than to comply, given CPT management's explicit warnings that non-compliance was not an option.

138.    An illustrative example of CPT's intentional overscheduling and understaffing occurred in or around October or November 2020 when Spring Holcombe, a PTA, was out sick. Despite knowing that Holcombe was unavailable, CPT scheduled Bowen to treat seven Medicare patients at CPT's Chipley location in a single-hour slot. Only one PTA was available to assist Bowen.

139.    Bowen felt uncomfortable treating so many patients at once, with only one PTA to assist, and she knew that she could not provide medically adequate physical therapy services to seven patients in a single hour.

140.    Yet Gloria, the PTA assisting Bowen at the time, reminded Bowen that she and Bowen would be fired if they attempted to reschedule any of the patients for a later time.

141.    Feeling that they had no other options, Bowen and Gloria chose to provide each patient with fifty-five minutes of group therapy and five minutes of individualized treatment. This

required Bowen to use the Group Therapy billing code 97150, which would charge Medicare for the single unit of group therapy, rather than multiple units of individualized therapy.

142.    However, CPT did not allow Bowen or the other PTs to bill Medicare using code 97150. In fact, the standardized forms that CPT's clinical staff filled in for treatment services – and which provided the basis for Medicare reimbursement claims – did not even provide group therapy codes as an option for billing.

143.    Moreover, any time Bowen or another CPT employee billed for less than four "units" of individual physical therapy services, they had to explain their reasoning to CPT management. CPT also made clear that any continued billing of less than four units of individual services would result in punishment or termination.

144.    As a result, CPT knowingly used blatantly improper billing codes to charge Medicare for individual services rendered to the seven patients at four units each. This would amount to a total of *twenty-eight* units of *individual* service.

145.    In reality, CPT should have only charged Medicare for a *single* unit of *group* therapy.

146.    In the end, each of the seven Medicare patients received only group therapy for fifty-five minutes of his or her hour-long session, yet CPT claimed and was reimbursed for the twenty-eight units of individual physical therapy services.

147.    Because a unit of individual therapy services only accrues after 8 minutes, and each patient only received 5 minutes of individual therapy, CPT was not entitled to receive reimbursement for even a single unit of individual therapy in this scenario.

148.    CPT's manipulation of billing codes was not an isolated occurrence. With unnerving regularity, CPT misused billing codes and misclassified bills to earn unauthorized reimbursements from Medicare.

149.    For instance, the typical Medicare patient at CPT receives an hours-worth of physical therapy from CPT, and the resulting bill will generally show four units of physical therapy services. During Relator Bowen's time at CPT, such bills would include two to three units of therapeutic exercise and a unit of manual therapy or electrical stimulation.

150.    However, most of these CPT patients would receive *at most* a single unit of individual therapy and then group therapy for the rest of the hour. In each of these cases, however, CPT billed for multiple units of individual services.

151.    CPT's intentional and fraudulent manipulation of billing codes resulted in routine and systematic submission of bills for individual PT services that were never rendered, and caused the payment of thousands of dollars for individual PT for patients who never received the individual therapy specified by their plan of treatment.

152.    Thus, not only did CPT defraud the government in its routine billing for services it did not provide, it also consistently mistreated and under-treated its patients who never received the individual physical therapy services they needed.

**D.    CPT Purposefully Violates Medicare Recordkeeping Regulations to Hide its Fraudulent Billing.**

153.    To further its fraudulent billing and prevent detection from regulators, CPT employed a purposefully inaccurate, noncompliant, and misleading recordkeeping system.

154.    Proper clinical recordkeeping is necessary not only to ensure compliance with Medicare regulations and protect against fraudulent billing, but also to provide optimal care for the patient.

155.    For this reason, CMS requires that physical therapy clinics billing Medicare "maintain[] clinical records on all patients in accordance with accepted professional standards, and practices." 42 C.F.R. § 485.721

156.    Specifically, "clinical records [must be] completely and accurately documented, readily accessible, and systematically organized to facilitate retrieving and compiling information." *Id.*

157.    In addition, each PT must "sign[] the entries that he or she makes in the clinical record." *Id.*

158.    Throughout Relator Bowen's tenure with the clinic, CPT knowingly disregarded these explicit requirements by maintaining an intentionally poor recordkeeping system that relied on inaccurate documentation, falsified signatures, arbitrary alterations, and no original backups.

159.    The purpose of this inefficient and intentionally inaccurate system of recordkeeping was to both support the fraudulent billing described previously, and to conceal that fraud from patients and regulators.

> a.    CPT Intentionally Alters Records of Physical Therapy Evaluations to both Conceal and Perpetuate its Fraudulent Billing Scheme.

160.    CPT's recordkeeping process begins with a handwritten evaluation of the patient that is signed by the evaluating PT.

161.    Upon completion of the patient evaluation, the evaluating PT turns in their signed notes to CPT's administrative assistant. During Relator Bowen's tenure at CPT, that assistant was Ashley McColgin.[18] The administrator then scans the signed, handwritten evaluation notes into the patient's electronic file.

---

[18] CPT's website asserts that McColgin oversees "inputting all of the intake paperwork handwritten by the clinical staff into [CPT's] online database." *Administrative Staff*, CHIPLEY PHYSICAL THERAPY (last visited Oct. 4, 2021), https://www.chipleypt.com/admin-staff.

162.    During Relator Bowen's time with CPT, McColgin would then bill for the evaluation by typing up an electronic version of the evaluation notes based on what the evaluating PT wrote in their handwritten notes.

163.    However, when transferring the handwritten notes to a typed-up, electronic version of the notes used for billing, McColgin would often disregard the signature and change the provider identity of the evaluating PT.

164.    For instance, on physical therapy evaluations performed by Bowen prior to being a fully approved Medicare/Medicaid provider, McColgin would disregard the handwritten evaluation notes signed by Bowen and input Lorrie Laurel as the PT who provided the evaluation on the electronic form. This occurred despite the fact that Lorrie never supervised Bowen and was rarely ever even in the same clinic at the same time as Bowen.

165.    Likewise, for physical therapy evaluations and treatments performed by Matt, who was not yet an approved provider by CMS, McColgin would disregard his signature on the handwritten notes and input either Lorrie or Bowen, who had at that point been fully approved by CMS, as the PT who provided the evaluation. Again, this alteration in the clinical record was made arbitrarily, as neither Lorrie nor Bowen supervised Matt when he provided physical therapy treatment and evaluation services.

166.    Importantly, it was this falsified, recreated version of the evaluation notes – not the scan of the original, signed and handwritten notes – that CPT would send to CMS to request reimbursement for physical therapy evaluation services provided to Medicare patients.

167.    As a result, Medicare made payments to CPT for physical therapy evaluation services based on inaccurate and falsified records.

    b.   <u>CPT Intentionally Alters Records of Physical Therapy Treatments to both Conceal and Perpetuate its Fraudulent Billing Scheme.</u>

168.   Following the initial evaluation, PTs and supervised PTAs begin to provide physical therapy services in accordance with the patient's plan of treatment.

169.   For each physical therapy service provided, the PT or PTA actually providing the service to the patient makes handwritten notes regarding the treatment.

170.   As described previously, CPT allowed services to be provided and notes to be made by PTAs with absolutely no supervision from a qualified PT, in direct contravention of Medicare regulations. *See, e.g.*, 42 C.F.R. § 485.713.

171.   The handwritten notes used for physical therapy treatment services are made on a standardized "S.O.A.P." form, which includes *Subjective* notes (what the patient complains of), *Objective* notes (measurements, range of motion, tests performed etc.), an *Assessment* (the PT's professional judgment of the patient's condition based on the subjective and objective notes), and a *Plan* (a determination of the focus of the next treatment and what areas need improvement).

172.   The S.O.A.P. form contains billing codes and are used as the basis for CPT's eventual bill to Medicare for therapy services.

173.   CPT instructed its PTs and PTAs to omit the time-in and time-out of a therapy session from their S.O.A.P. notes.

174.   Rather, the PT or PTA would simply notate how many "units" of physical therapy were provided, with one unit being a minimum of eight minutes.

175.   Once the PT or PTA providing the services finished filling out the patient's S.O.A.P. form, he or she would turn the now-filled-out S.O.A.P. form to Ashley McColgin in CPT's administrative department.

176.    McColgin would then input the handwritten S.O.A.P. notes into an electronic format used for billing and long-term recordkeeping purposes.

177.    However, on instruction from CPT management, McColgin rarely input the handwritten S.O.A.P. in an accurate manner.

178.    For any S.O.A.P. note that did not contain a time-in and time-out for the services rendered – which was almost every S.O.A.P. note – McColgin would arbitrarily create a time-in and time-out.

179.    For services provided by ineligible personnel – whether unsupervised PTAs and techs, or not-yet-CMS-approved PTs – McColgin would arbitrarily enter the name and national provider number of a PT who never saw the patient.

180.    For example, for any services provided by Wayne Taylor, a PTA, while unsupervised at Bonifay, McColgin would input either Lorrie Laurel or Relator Bowen as the supervising or treating PT.

181.    The same also occurred for any unsupervised and ineligible physical therapy services provided at the Chipley location by Melissa, a massage therapy technician who provided unsupervised aquatic therapy services; Gloria and Bridget, PTAs who were forced to provide unsupervised physical therapy services; and Robbin, Amanda, and Sarah, all untrained administrative office workers who provided unsupervised and ineligible services.

182.    In each of the above examples, CPT required McColgin to input the name and national provider number of a PT who was not in the S.O.A.P notes and who neither treated nor supervised the treatment of the patient in question. Often, the PT inputted into the electronic version was never even in the same building as the patient being treated.

183.    Once the information from the handwritten S.O.A.P. note was inputted into the computer, often inaccurately and arbitrarily, the original S.O.A.P. note would be shredded.

184.    As a result, the only remaining record of the patient's treatment with a CPT physical therapist or PTA would be the falsified and inaccurate electronic version.

185.    The purpose of this intentionally roundabout system of inputting handwritten notes into electronic format and then destroying the original, physical notes was to both further CPT's fraudulent billing practices and conceal them from regulators and patients.

186.    Intentionally inputting inaccurate and blatantly false information into the electronic record – such as a false provider name and national provider number, inaccurate billing codes, and arbitrary times of service – helped CPT receive unearned and inflated Medicare payments. For instance, altering the name and national provider number of the person supplying the services would make otherwise ineligible services appear eligible for reimbursement, and recording inaccurate billing codes and descriptions of service would provide justification for inflated reimbursements.

187.    This same misidentification also helped conceal CPT's fraud because, after the original notes were shredded, the electronic records made up the only documentation of a given patient's treatment.

188.    Thus, even if a patient was *actually* treated by Wayne Taylor at Bonifay while Relator Bowen was at Chipley, the falsified electronic record would support the bill to Medicare stating that Bowen either supervised Taylor or provided the service herself.

189.    CPT's recordkeeping not only violated Medicare regulations regarding accuracy and signature, *see* 42 C.F.R. § 485.721, but it also endangered the health of patients.

190.    For instance, CPT frequently received calls from physicians and insurers asking for details regarding a specific patient's treatment.

191.    Because CPT required the original S.O.A.P. notes to be destroyed upon entry into the computer, its therapists were forced to rely on the often-manipulated information entered into its billing system by Ashley McColgin, calling into question whether the notes contained accurate details of the patient's treatment.

192.    By maintaining an intentionally noncompliant recordkeeping system, CPT attempted to both further and conceal its fraudulent billing. In doing so, CPT not only received inflated Medicare reimbursements and deceived regulators, but it did so to the direct detriment of its patients' well-being.

### E.    CPT Created and Maintained a Corporate Culture of Intimidation and Fear to Conceal its Fraud and Enforce Compliance with its Policies.

193.    CPT was aware that it was violating Medicare regulations and that it was receiving both inflated and ineligible reimbursements from CMS as a result.

194.    To both conceal its ongoing fraud and ensure that its employees would comply with its fraudulent billing scheme, CPT, by and through its co-owners Ruben and Lorrie Laurel, created and maintained a corporate culture of intimidation and fear.

195.    CPT ignored, reprimanded, intimidated, and threatened to terminate its employees when they questioned CPT's practices, voiced their concerns regarding patient care, or otherwise seemed likely to reveal CPT's unlawful schemes.

196.    During her 13-month tenure at CPT, Bowen witnessed Ruben Laurel and CPT's administrative staff evade, reprimand, then intimidate and threaten Bowen and other employees who attempted to follow Medicare regulations.

197.    When evasion alone was ineffective, CPT turned to express punishment and threats of termination to stifle dissent among its staff.

198.    For instance, CPT made clear to its clinical staff that any attempts to turn away or reschedule patients would end in termination.

199.    In fact, both Gloria and Bridget – PTAs working with Bowen at CPT's Chipley location – confided in Bowen that they felt they had no choice but to provide group therapy services or lose their jobs. This was even though both Gloria and Bridget had voiced their concerns to Ruben Laurel that it was both unsafe and unethical for them to attempt to treat so many patients at one time.

200.    In or around August 2020, when Gloria confronted Ruben about not feeling comfortable treating more than two patients at once, Ruben offered an ultimatum: they could continue to do so or find another job.

201.    Regardless of efficacy or safety, CPT insisted that its employees maximize patient interaction and punished or threatened to terminate any employees who failed to do so.

202.    If a Medicare patient did not show up or refused treatment, CPT harshly reprimanded the PT in charge of the patient and ordered that they call the patient and coax them back for additional treatment.

203.    Notably, this did not occur for Medicaid patients, as CPT generally received lower reimbursements for Medicaid patients than for Medicare patients. In fact, on more than one occasion a Medicaid patient missed an appointment and, when Bowen asked whether they should try to get in contact with the patient, she was told "Who cares? They're Medicaid."

204.    CPT also reprimanded and intimidated anyone who billed for less than four "units" of time.

205.    Any time that a PT or PTA recorded in their S.O.A.P. notes that they provided less than four units of physical therapy services, which can amount to anywhere between 32- and 88-minutes total, CPT would require a full explanation of why they did not provide more units of service.

206.    This occurred regardless of the amount and duration of care specified in the patient's plan of treatment and even occurred when patients arrived several minutes late to their appointment.

207.    Furthermore, CPT made clear any continued billing of less than four units of service per patient would amount to underperformance, and the offending PT or PTA would be subject to termination.

208.    CPT's systematic use of evasion, punishment, and veiled threats of termination – led primarily by co-owner and CEO Ruben Laurel – created a corporate culture of intimidation and fear in which employees such as Bowen felt that they had no choice but to accept their situation and join into CPT's fraudulent scheme.

209.    By and through this corporate culture of intimidation and fear, CPT enforced compliance with its fraudulent billing scheme and received unearned and inflated Medicare reimbursements as a result.

## COUNT ONE
### PRESENTING OR CAUSING TO BE PRESENTED FALSE CLAIMS UNDER 31 U.S.C. § 3729

210.    Relator adopts and incorporates the preceding paragraphs as though fully set forth herein.

211.    By and through the fraudulent schemes described herein, Defendant knowingly – by actual knowledge or in deliberate ignorance or with reckless disregard of the truth or falsity of

the information – presented or caused to be presented false or fraudulent claims to the United States for payment or approval, as follows:

    a)    Defendant fraudulently billed for inadequate and ineligible services provided by non-physical therapists – including physical therapy assistants, technicians, and untrained office staff – without supervision from a qualified physical therapist;

    b)    Defendant fraudulently altered patient records and bills and failed to apply necessary billing code modifiers to make it appear as if physical therapists provided or supervised services actually provided by a non-physical therapists;

    c)    Defendant fraudulently used individual therapy billing codes for group therapy services;

    d)    Defendant fraudulently maintained an intentionally inaccurate and inefficient recordkeeping system to both further and conceal its fraudulent billing.

212.    The United States paid the false claims described herein.

213.    Defendant's fraudulent actions, as described *supra*, are part of a widespread, systematic pattern and practice of knowingly submitting or causing to be submitted false claims to the United States through fraudulent use of codes and fraudulent billing of the United States through Medicare or Medicaid.

214.    Defendant's fraudulent actions described herein have resulted in damage to the United States equal to the amount paid or reimbursed to Defendant and others by the United States through Medicare and Medicaid for such false or fraudulent claims.

WHEREFORE, Relator demands judgment in their favor on behalf of the United States, and against Defendant, in an amount equal to treble the damages sustained by reason of

Defendant's conduct, together with civil penalties as permitted by 31 U.S.C. § 3729, attorneys' fees and costs, and such other, different, or further relief to which Relators may be entitled.

## COUNT TWO
## MAKING OR USING FALSE STATEMENTS OR RECORDS MATERIAL TO A FALSE CLAIM UNDER 31 U.S.C. § 3729

215.    Relator adopts and incorporates the factual allegations contained in the previous paragraphs as though fully set forth herein.

216.    By and through the fraudulent schemes described herein, Defendant knowingly – by actual knowledge or in deliberate ignorance or with reckless disregard of the truth or falsity of the information – made, used, or caused to be made or used, false records or statements material to a false or fraudulent claim or to get a false or fraudulent claim paid or approved by the United States in that Defendant fraudulently used the coding system and other false records intended to support its fraudulent billing to the United States, all in violation of 42 U.S.C. §1395y and the Medicare regulations cited *supra*.

217.    The false records or statements described herein were material to the false claims submitted, or caused to be submitted, by Defendant to the United States.

218.    In reliance upon Defendant's false statements and records, the United States paid false claims that it would not have paid if not for those false statements and records.

219.    Defendant's fraudulent actions described herein have resulted in damage to the United States equal to the amount paid or reimbursed to Defendant and others by the United States for such false or fraudulent claims.

WHEREFORE, Relator demands judgment in their favor on behalf of the United States, and against Defendant, in an amount equal to treble the damages sustained by reason of

Defendant's conduct, together with civil penalties as permitted by 31 U.S.C. § 3729, attorneys' fees and costs, and such other, different, or further relief to which Relators may be entitled.

## COUNT THREE
## "REVERSE FALSE CLAIMS" UNDER 31 U.S.C. § 3729(a)(1)(G)

220.    Relator adopts and incorporates the factual allegations contained in the previous paragraphs as though fully set forth herein.

221.    By and through the fraudulent schemes described herein, Defendant knowingly – by actual knowledge or in deliberate ignorance or with reckless disregard of the truth or falsity of the information – made, used, or caused to be made or used, false records or statements material to an obligation to pay or transmit money or property to the United States, or knowingly concealed or knowingly and improperly avoided an obligation to pay or transmit money or property to the United States.

222.    Defendant knew that it had received inflated Medicare payments based on inaccurate and falsified coding and billing, yet Defendant took no action to satisfy its obligations to the United States to repay or refund those payments and instead retained the funds and continued to bill the United States.

223.    As a result of Defendant's fraudulent conduct, the United States has suffered damage in the amount of funds that belong to the United States but are improperly retained by Defendant.

WHEREFORE, Relator demands judgment in their favor on behalf of the United States, and against Defendant, in an amount equal to treble the damages sustained by reason of Defendant's conduct, together with civil penalties as permitted by 31 U.S.C. § 3729, attorneys' fees and costs, and such other, different, or further relief to which Relators may be entitled.

**COUNT FOUR**
**CONSPIRACY UNDER 31 U.S.C. § 3729(a)(3)**

224.    Relator adopts and incorporates the factual allegations contained in the previous paragraphs as though fully set forth herein.

225.    Defendant knowingly presented, or caused to be presented, false or fraudulent claims to the United States for payment or approval through the fraudulent use of reimbursement codes and presented or caused to be presented false claims to the United States through Medicare or Medicaid for payment of same.

226.    The United States paid Defendant for such false claims.

227.    Defendant, in concert with its principals, agents, employees, subsidiaries, and other institutions did agree to submit such false claims to the United States.

228.    Defendant and its principals, agents, and employees acted, by and through the conduct described *supra*, with the intent to defraud the United States by submitting false claims for payment to the United States through Medicare or Medicaid.

229.    Defendant's fraudulent actions, together with the fraudulent actions of its principals, agents, and employees, have resulted in damage to the United States equal to the amount paid by the United States to Defendant and others because of Defendant's fraudulent claims.

WHEREFORE, Relator demands judgment in their favor on behalf of the United States and against Defendant, in an amount equal to treble the damages sustained by reason of Defendant's conduct, together with civil penalties as permitted by 31 U.S.C. § 3729, attorneys' fees, costs, interest, and such other, different, or further relief to which Relators may be entitled.

Dated: December 14, 2021.

By: */s/ Ryan B. Hobbs*
RYAN B. HOBBS, ESQ.
**BROOKS LEBOUEF FOSTER GWARTNEY**

**LEACE & HOBBS, P.A.**
909 East Park Avenue
Tallahassee, Florida 32301
850.222.2000 / 850.222.9757 (fax)
rhobbs@tallahasseeattorneys.com
jeanetta@tallahasseeattorneys.com

and

OSCAR M. PRICE, IV, ESQ. (*Pro Hac forthcoming*)
JACOB M. TUBBS, ESQ. (*Pro Hac forthcoming*)
**PRICE ARMSTRONG, LLC**
2226 1st Avenue South, Suite 105
Birmingham, AL 35233
205.208.9588 / 205.208.9525 (fax)
oscar@pricearmstrong.com
jacob@pricearmstrong.com

*Attorneys for Plaintiffs/Relators*